774 So.2d 492 (2000)
Mary Lucille (Paulk) REDD, Appellant,
v.
Zelmer Gordon REDD, Appellee.
No. 97-CA-00706-COA.
Court of Appeals of Mississippi.
November 28, 2000.
*493 William D. Boerner, Brookhaven, Attorney for Appellant.
Edward P. Lobrano Jr., Ridgeland, Attorney for Appellee.
BEFORE McMILLIN, C.J., LEE, AND MOORE, JJ.
MOORE, J., for the Court:
¶ 1. After thirty-two years of marriage, Mary Lucille Paulk Redd was granted a divorce from Zelmer Gordon Redd on habitual cruel and inhuman treatment grounds. The Lincoln County Chancery Court assessed the value of the marital estate at $4,600,000, and awarded Mary Lu marital assets totaling $1,194,230. Mary Lu appeals, claiming that the chancellor grossly undervalued the marital estate and failed to distribute the marital property equitably. We have found manifest error in the chancellor's valuation of the marital estate; thus, we reverse and remand for reasons more fully developed below.

FACTS
¶ 2. Mary Lu and Gordon Redd were married in June 1963. Of this union, four children were born. Mary Lu taught school for approximately three years during the beginning of the marriage and Gordon worked for his father. In 1968, Gordon quit working for his father and established his own business in the timber industry. Mary Lu quit her teaching job to help Gordon with the bookkeeping aspects of his business. Mary Lu invested her teaching income of approximately $8,000 in the business. She worked in the business, without remuneration, for five years until their fourth child was born. At that time, the business was financially able to hire someone to take over Mary Lu's responsibilities. Mary Lu and Gordon both decided that Mary Lu should stay at home and care for their family. As all of the children were active in various extracurricular activities, Mary Lu was quite busy in her capacity as stay-at-home mother. Gordon continued to run his business. During the course of the marriage, Gordon became the owner of three businesses and the controlling shareholder in a fourth business.
¶ 3. Mary Lu testified to years of physical abuse she endured at Gordon's hands. During the course of the marriage, she sustained multiple injuries including bruises, a black eye, and a cracked bone and sprained wrist. All four children, who were adults at the time of the trial, corroborated the physical abuse. During one period of separation, Gordon fathered an illegitimate child. Mary Lu and all of the children acknowledged that Gordon was an excellent provider. However, one of the children testified that her father was the meanest person she ever knew. Son Randy testified that he feared that Gordon would one day harm his mother. Gordon did not contest the divorce on habitual cruel and inhuman treatment grounds.
¶ 4. After hearing two days of testimony, the chancellor continued the trial and appointed a special master to assist him in determining the value of the marital assets. The chancellor authorized the special master to retain various experts to determine the value of assets owned by Gordon individually and by his businesses. When the special master completed this task, the trial recommenced. The chancellor received Exhibit 102 into evidence *494 which was a list of the property owned by the parties. Exhibit 102 included stipulated values of much of the marital property. Exhibit 102 also contained the appraised value, as per the experts retained by the special master, of the real estate to which the parties could not stipulate a value.
¶ 5. At the conclusion of trial, the chancellor took the case under advisement. He notified the parties by mail of his findings of fact and conclusions of law, and directed Mary Lu's attorney to draft a final order in accordance with his findings and conclusions. The chancellor valued the marital estate at $4,600,000 and awarded Mary Lu the following portion of the marital estate: bank stock, the marital residence, her Ford Explorer, and 100.83 acres of timber land. These items have a total value of $854,230. Additionally, the chancellor ordered Gordon to pay Mary Lu $340,000 cash, with $100,000 to be paid within fifteen days, and the remaining $240,000 to be paid in $2,000 monthly installments. This cash award was initially assessed as lump sum alimony; however, citing tax reasons, Mary Lu petitioned the chancellor to re-label the cash award as equitable distribution proceeds. The chancellor complied with this request. The distribution of marital property to Mary Lu totaled $1,194,230. Taking the present cash value of the installment payments into account, Mary Lu's portion of the $4,600,000 was twenty-three percent.
¶ 6. Gordon was awarded the remainder of the marital assets, including the businesses, and the chancellor adjudged him solely responsible for all of the liabilities of the businesses and all of the individual obligations of the parties up to the date of the divorce. Gordon was also directed to pay the court costs which included the special master's fee and the fees of the experts retained by the special master which the chancellor assessed as $25,845.30.

LAW AND ANALYSIS

DID THE CHANCELLOR ERR IN HIS VALUATION AND DISTRIBUTION OF THE MARITAL ESTATE?
¶ 7. We must affirm the chancellor's findings "`unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.'" Ferguson v. Ferguson, 639 So.2d 921, 930 (Miss.1994) (quoting Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990)). Mississippi is not a community property state; thus, the chancellor is not required to divide marital property equally. Parker v. Parker, 641 So.2d 1133, 1137 (Miss.1994). "The chancellor does, however, retain the power and authority to effect an equitable division of jointly accumulated property acquired during the marriage and the division of property and his decision will not be overruled absent manifest error." Id.
¶ 8. Mary Lu argues that the chancellor's finding that the marital estate is worth $4,600,000 is manifestly flawed. She further complains that twenty-three percent of $4,600,000 is not an equitable distribution of the marital estate under the circumstances of this case. Mary Lu suggests that this Court utilize the appraisals from the special master's report for the timber valuation and for the valuation of the contested real estate. The chancellor, in fact, accepted these appraisals in his final judgment. Mary Lu insists, however, that we should not utilize the business appraisal procured by the special master. Instead, Mary Lu suggests that we review financial statements dated 1994 and 1995 in which Gordon's individual net worth, together with the net worth of the businesses, was stated as approximately $12,000,000. These financial statements were on file at the Copiah Bank where Gordon has a loan balance of $400,000 to $600,000. There is some dispute as to who provided the figures used in the statements, although the statements themselves contain a notation that the figures were obtained from Gordon's accountant and long-time friend Roger Calcote. Mary Lu *495 suggests that to be fair, this Court should divide the net worth stated in these financial statements in half, and adopt this figure as the "equity value" of the businesses.
¶ 9. We reject Mary Lu's invitation to assess the "equity value" of the businesses as one-half of the "net worth" listed in the financial statements. The Ferguson court has held:
Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case.
Ferguson, 639 So.2d at 929.
¶ 10. The special master retained Dr. David Culpepper to assess the fair market value of the businesses. Dr. Culpepper testified that fair market value is "the most likely price at which the business would change hands between a willing buyer and a willing seller." Dr. Culpepper noted in his appraisal that he had to rely upon information provided by Gordon or Gordon's employees. He testified that he took this into consideration in the methodology he used to assess fair market value. Specifically, Dr. Culpepper spent more time on industry analysis as to the market for these types of businesses. He also talked to other sawmill operators and conducted both hard copy and internet research. The figure provided by Dr. Culpepper as the fair market value of the businesses is the only statement of fair market value in the record.
¶ 11. The chancellor expressed his concern in his findings of fact and conclusions of law that the special master relied solely upon information supplied by Gordon or Gordon's employees in determining the value of the businesses. However, the chancellor regarded this valuation to be "the best, most reliable, appraisal figures available on those items in dispute." Since Dr. Culpepper's computation is the only statement of fair market value on the record, we cannot say that the chancellor committed manifest error by accepting this figure.
¶ 12. We have, however, found manifest error in the chancellor's calculation of the total value of the marital assets. The chancellor stated that the total value of the marital assets was $4,600,000. Using the values of the property that the chancellor adopted in his final judgment, the total value of the marital estate exceeds $4,600,000 by $460,412. Specifically, the chancellor stated in his final judgment that he adopted the parties' stipulated valuations set out in Exhibit 102. As to the property to which the parties would not stipulate a value, the chancellor accepted the appraisals relied upon by the special master. If the computations are made according to the chancellor's findings, the value of the marital estate would be as follows:

 Value of businesses
 (Culpepper appraisal): $ 496,685
 Value of equipmentstipulated
 amount: 1,781,698
 Value of real estatestipulated
 amount: 481,513[1]
 Value of real estatenot
 stipulated -(McGee appraisal): 749,000[2]
 Value of timber (Sirmon's
 appraisal) 423,438
 Value of personal assets
 stipulated amount: 1,027,578
 Cash maintained by Mr.
 Redd¶ 1 final judgment: 100,500
 Total: $ 5,060,412
 Less: 4,600,000
 Discrepancy: $ 460,412

*496 ¶ 13. Excluding $460,412 from the total marital estate valuation is manifest error.
¶ 14. Further, the chancellor adjudicated Gordon as the sole owner of the horses and riding equipment, stating that Gordon inherited these items from his father. This finding is manifestly wrong. Gordon testified that he inherited one horse from his father. Gordon did not include this horse in determining the value of the horses and riding equipment that he acquired during the course of the marriage. Gordon testified that his horses were worth $7,094 and his riding equipment, horse trailers, and Amish buggy were worth $2,649. Adding the value of the horses and riding equipment to the above total, the value of the marital estate is $5,070,155. Thus, using the final judgment as a guide, the value of the marital estate is $470,155 more than the $4,600,000 assessed by the chancellor. This is manifest error.
¶ 15. We reverse this case and instruct the chancellor on remand to reconsider the distribution of marital assets to Mary Lu in light of the valuation error, keeping in mind the guidelines set forth in Ferguson. We do not address whether the chancellor's distribution to Mary Lu was equitable since we do not yet know what portion of the discrepancy in the valuation the chancellor will award on remand. We note, however, in light of the highly deferential standard of review, that twenty-three percent of the total estate, standing alone, is not grounds for reversal. This is especially true since the assets awarded to Mary Lu were of the type that would be easy to liquidate, while Gordon received ongoing business concerns together with total responsibility for the liabilities attached thereto.
¶ 16. THE JUDGMENT OF THE LINCOLN COUNTY CHANCERY COURT IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF APPEAL ARE ASSESSED TO APPELLEE.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, AND MYERS, JJ., CONCUR. PAYNE, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. THOMAS, J., NOT PARTICIPATING.
PAYNE, J., concurring:
¶ 17. I concur wholeheartedly with the majority, but I would remind the chancellor, in his reconsideration on remand, that domestic services are to be valued no less than monetary contributions. Hankins v. Hankins, 729 So.2d 1283, 1287 (Miss.1999); Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994); Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994) (guideline lb). The record is replete with testimony that it was the appellant who maintained the home and kept the family life intact unassisted and even hindered by her husband.
KING, P.J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] In determining the stipulated value of the real estate, we did not consider the property described, under number five of Exhibit 102, as Sec. 26 T5N, R7E because the parties disputed the timber being included in the value. This property was appraised at $58,000 without the timber. Sirmon's timber appraisal included the value of the timber on all of the real estate, including Sec. 26 T5N, R7E.
[2] We included the $58,000 appraised value of Sec. 26 T5N, R7E in determining the total value of the real estate not stipulated.