# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00809-COA

**CHRISTOPHER WALTER POND**                                      **APPELLANT**

**v.**

**WANDA CARLEEN POND**                                              **APPELLEE**

DATE OF JUDGMENT:                04/12/2019
TRIAL JUDGE:                            HON. TROY FARRELL ODOM
COURT FROM WHICH APPEALED:    RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          ROBERT RUSSELL WILLIARD
ATTORNEY FOR APPELLEE:           EMILY ROBERTSON SUMRALL
NATURE OF THE CASE:               CIVIL - DOMESTIC RELATIONS
DISPOSITION:                          AFFIRMED - 08/25/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.

## WESTBROOKS, J., FOR THE COURT:

¶1.     The Rankin County Chancery Court granted Wanda Carleen Pond (Wanda) a divorce

from Christopher Walter Pond (Chris). Chris appeals, asserting that the trial court incorrectly

declined reconsideration of (1) the valuation assigned to Chris's pension plan and (2) the

division of the marital assets. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Chris and Wanda were married on or about May 1, 1999. From their union, one male

child, Garrett was born in August 2001.    On November 22, 2017, Wanda filed a "Complaint

for Divorce and Request for Temporary Relief."[1]  Chris moved out of the marital home in

_____

[1] Wanda filed an "Amended Complaint for Divorce and Request for Temporary Relief" on January 22, 2019, and another one on February 6, 2019.

February 2018, and the parties entered into an agreed temporary order on August 17, 2018.

¶3. On February 11, 2019, the case proceeded to trial. Testimony from the parties revealed that over the course of their marriage, both Chris and Wanda worked and made financial contributions to support their family. Chris experienced some gaps in employment due to injuries and struggles with depression and substance abuse/addiction. Chris admitted that he struggled with money management, so Wanda stewarded their household expenses. The couple maintained separate finances throughout their marriage, but, when able, Chris wrote Wanda monthly checks as his contribution to the household and testified that Wanda had access to his checking account to pay bills. Wanda's also testified that Chris paid her half of the money for their expenses except for the periods where his income decreased while he sought treatment and rehabilitation for the aforementioned health issues and addiction. Chris's inability to manage his finances ultimately led him to file bankruptcy on February 2, 2017; Wanda was not a party to the bankruptcy case, which listed her as a "non-filing spouse."

¶4. During his testimony, Chris also admitted to engaging in an extramarital affair after he and Wanda separated but before their divorce was finalized. On February 21, 2019, the chancellor issued a bench opinion, granting Wanda a divorce from Chris "based on clear and convincing evidence of uncondoned adultery."

¶5. The "Final Judgement of Divorce" was entered on April 12, 2019.[2] The court indicated August 17, 2018, as the end date of marital property accumulation and June 1,

---

[2] The final order made the divorce effective as of February 11, 2019.

2017,[3] as the end date of marital property accumulation with regard to the marital home. Although the parties failed to present appraisals, expert testimony or other reliable evidence as to the value of the marital home, the court valued the property at $159,250, which was derived from the median of the values in Chris's and Wanda's respective Rule 8.05 financial statements. UCCR 8.05. The court also found that the marital property was in need of significant repairs totaling $6,300 and factored that cost into the home's value. After accounting for the remaining balance of the mortgage loan, the court calculated $79,953 as the amount of equity in the marital home. Wanda's entire 401(k), valued at $123,601, was found to be marital property in addition to $169,140.49 of her profit sharing account. Chris's pension, valued at $169,140.49, and his remaining 401(k), valued at $18,000, were also included in the marital property. Additional jewelry, guitars, guns, tools and other assets together were valued at $10,640, and deemed marital property.

¶6.     The court granted Wanda full use and possession of the marital home and ordered her solely responsible for the payment of the mortgage note. Wanda was also ordered to either sell or refinance the marital home by September 30, 2019 and to pay Chris $50,000, less one-half of the standard closing costs. Both parties retained ownership of their respective 401(k) and pension/profit sharing plans. Chris was granted exclusive ownership of all tools, the tool box, guns, and the gun safe. Wanda was granted exclusive ownership of all other personal property accumulated during the marriage and located in the marital home. Both parties were denied attorney's fees.

---

[3] June 1, 2017, is "the date upon which Mr. Pond stopped paying toward the mortgage note, utilities, upkeep and repair."

¶7.     On April 24, 2019, Chris filed a "Motion for Reconsideration" pursuant to Rule 59

of the Mississippi Rules of Civil Procedure and attached his pension account statement,

reflecting its true balance of $36,635.70.  Due to its untimeliness, the trial court converted

Chris's pleading to a Rule 60(b)(3) motion.[4]  On August 22, 2019, the trial court entered an

"Order Denying Motion for Reconsideration,"from which this appeal stems.

¶8.     On appeal, Chris challenges the chancellors valuation of his pension plan and the

division of marital assets.

## STANDARD OF REVIEW

¶9.     A chancellor's finding in a domestic case will not be disturbed "unless manifestly

wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard."

*Henderson v. Henderson*, 703 So. 2d 262, 264 (¶13) (Miss. 1997) (quoting *Johnson v.*

*Johnson*, 650 So. 2d 1281, 1285 (Miss.1994)). "The distribution of marital  assets in a

divorce will be affirmed if 'it is supported by substantial credible evidence.' " *Lowrey v.*

*Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss.2009) (quoting *Bowen v. Bowen*, 982 So. 2d 385,

393-94 (¶32) (Miss. 2008)).

## DISCUSSION

I.      **Whether the trial court erred in assigning value to Chris's
        pension plan.**

---

[4] M.R.C.P. 59(e) requires a motion to alter or amend the trial court's order to be filed "not later than ten days after the entry of the judgement."  "If a motion is mislabeled as a motion for reconsideration and was filed within ten days after the entry of judgment, the trial court should treat such motion as a post-trial motion to alter or amend the judgment pursuant to M.R.C.P. 59(e)."  M.R.C.P. 59 cmt. (citing *Boyles v. Schlumberger Tech. Corp.*, 792 So. 2d 262, 265 (Miss. 2001)).

¶10. Chris first contends that the trial court erred when it valued his pension plan at $169,140.49. Chris asserts that the trial court went to "great lengths" to ascertain the value of Wanda's retirement accounts but incorrectly valued his plan based on unfounded speculation. In the following portion of the final judgement the trial court discusses its considerations for valuing Chris's plan:

> Mr. Pond's pension plan, and the benefits to be derived from it upon retirement, constitute marital property. Insufficient evidence was presented to this court for it to make a determination as to whether the plan had vested, or what benefits Mr. Pond would enjoy through it. Without better evidence, this Court finds said plan's value to be equal to Ms. Pond's profit sharing account value of $169,140.49, since the parties' salaries, work histories, type of and type of employment are so similar.

¶11. In his "Motion for Reconsideration" and on appeal, Chris argues that the statement reflecting his correct pension account balance should be accepted as new evidence and used to reconsider the parties' marital assets as relates to the pension funds. He further argues that neither Wanda's attorney nor the court subpoenaed the evidence regarding his pension account's value, and consequently, his newly disclosed statement should have been considered as newly discovered evidence.

¶12. Chris's attempt to shift the onus of proving his case to the trial court and the opposing party is misguided. To justify relief, Rule 60(b)(3) instructs that the "newly discovered evidence [must be evidence] which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) [i.e., within ten days of the final judgement]. M.R.C.P. 60 (b)(3). Here, the trial court found that Chris failed to present an adequate basis for the admission of the delayed valuation evidence. We agree.

5

¶13.  "[I]t is incumbent upon the parties, and not the chancellor [or opposing party], to prepare evidence touching on matters pertinent to the issues to be tried." *Seymour v. Seymour*, 960 So. 2d 513, 518 (¶11) (Miss. Ct. App. 2006) (quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999)).  Thus, it was Chris's responsibility *alone* to prepare and submit evidence of his account balances at trial.  Chris failed to submit the relevant documents at trial and failed to show that they were "undiscoverable" at trial or within the ten days following.

¶14.  Further, the trial court's valuation assessment was consistent with the information, or lack thereof, provided through Chris's testimony:

| | |
|---|---|
| Mrs. Jordan: | And do you have a retirement with Eaton? |
| Mr. Pond: | Yes. |
| Mrs. Jordan: | And how much is in the retirement? |
| Mr. Pond: | $18,000, in my 401(k). |
| Mrs. Jordan: | Okay. Are there – is there a pension plan with them? |
| Mr. Pond: | Yes. |
| Mrs. Jordan: | Huh? |
| Mr. Pond: | Yes. |
| Mrs. Jordan: | Okay.  Is that listed on your financial form? |
| Mr. Pond: | I'm not drawing it. |
| Mrs. Jordan: | Okay. But you've got a pension plan? |
| Mr. Pond: | There is a pension plan, yeah, but I don't draw it until I retire. |

| | |
|---|---|
| Mrs. Jordan: | I understand that, but you haven't listed anything about a pension plan; is that correct? |
| Mr. Pond: | I don't contribute to it. |
| Mrs. Jordan: | Okay. How much – do you have any indication about how much might be in it? |
| Mr. Pond: | No, I don't. |
| Mrs. Jordan: | You don't have any documentation regarding your pension? |
| Mr. Pond: | No, it's a non-contributory account. I don't know what is in there. I can probably try to find out through HR. |
| Mrs. Jordan: | Okay. But , you didn't feel that was important to bring that with you today? |
| Mr. Pond: | No, ma'am. |

Admittedly, Chris did not disclose the pension account initially, nor did he have any indication or documentation regarding its contents at the time of trial. In fact, the record reveals that Chris made misrepresentations regarding his financial picture to the trial and bankruptcy court. In the absence of any other evidence, the chancellor "proceed[ed] on the best information available." *Stribling v. Stribling*, 906 So. 2d 863, 870 (¶25) (Miss. Ct. App. 2005) (citing *Dunaway*, 749 So. 2d 1112, 1118, 1121 (¶¶ 14, 28) (Miss. Ct. App. 1999)).

¶15. In *Seymour v, Seymour*, 960 So. 2d 513, 518 (¶11) (Miss. Ct. App. 2006), this Court rejected the argument that the trial court erroneously assigned value to stock shares because "the only evidence presented at trial regarding the stock's value came from Phillip's Rule 8.05 financial declaration." Similarly, the only evidence available to the trial court here was

7

Chris's testimony and Rule 8.05 financial statement. Chris argues that the court failed to take into account several factors when assigning value to his pension plan. But, his assertion is not supported by the record. Evidence revealed that both parties had similar work histories, types of employments and salaries, and was substantial enough to support the chancellor's findings.

¶16. In *Benton v. Benton,* 239 So. 3d 545, 548 (¶7) (Miss. Ct. App. 2018), Tim, the appellant, sought reversal of the denial of a motion for new trial based on the need for a "proper business valuation based on the records prepared by his certified public accountant (CPA) since trial." The chancellor denied Tim's motion, noting a failure to provide "sufficient evidence" related to the valuation although he was "afforded ample opportunity and time" to do so during the litigation. *Id.* at (¶8). This Court "refused to hold [the chancellor] in error because of a party's failure to cooperate in providing the necessary documents for proper valuation." *Id.* at 548-49 (¶12).

¶17. Chris failed to provide any evidence related to the value of his pension plan until he submitted a post-trial motion, which the court denied because he failed to show that the account statements constituted newly discovered evidence. This issue is without merit.

## II. Whether the chancery court erred in its division of marital assets.

¶18. Next, Chris argues that the chancery court erred in its application of the *Ferguson*[5] factors to the facts of this case. Specifically, Chris claims that the court lacked substantial

---

[5] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994) (Enumerated guidelines for the chancery courts to "evaluate the division of marital assets" and required that courts "support their decisions with findings of fact and conclusions of law for purposes of appellate review.").

credible evidence to determine that (1) his addictions and medical conditions contributed to the dissipation of assets; (2) the workshop he built after draining his 401K added no value to the marital home; (3) Chris contributed to the destruction of the marriage through his addictions, poor financial dealings, and admitted adultery. The division marital assets "is a matter committed to the discretion and conscience of the court, having in mind all of the equities and other relevant facts and circumstances. *Id*. at 934 (citing *Bowe v. Bowe*, 557 So.2d 793, 794 (Miss.1990)). A review of the record reveals that there was substantial evidence to support the chancellor's findings.

### A. Dissipation of Assets

¶19. By Chris's own testimony, his addiction issues impacted his family both emotionally, physically, and financially:

| | |
|---|---|
| Mrs. Jordan: | Mr. Pond, do you believe that your alcohol or drug use has affected your family; and, if so, how? |
| Chris: | Yes, it has affected my family. How? It's taken me away from them emotionally, physically. *It's costing money*. |
| . . . . | |
| Mrs. Jordan: | Has it caused impulsive spending habits on your part? |
| Chris: | Yes, I've bought motorcycle parts and motorcycles, and things for racing impulsively. |
| Mrs. Jordan: | And has this sort of spending taken away from your family and their necessities of living? |
| Chris: | No. Because those were things that we ended up using for the motorcycle stuff; so, I don't think so. |

Although Chris now argues that his father covered the expenses for rehabilitation treatment, Wanda testified at trial that Chris's father only paid a portion of the treatment costs.

> Mr. Williard:       Okay. So all of those bills you've been talking that you've accumulated, they're not associated with his [Chris's] treatment.
>
> Wanda:             He [Chris's father] has paid some of them, yes. Bridge to Recovery, his father did not pay those. Those were all bills that our household incurred after his inpatient care.

Wanda also indicated that the majority of the contributions Chris provided while he was going through treatment went toward his medical bills and car payment. During that period, Wanda borrowed against her retirement accounts and spent her savings to keep their household on track without Chris's normal contributions. Chris's inability to contribute and incurring of the additional expenses was directly linked to his addiction issues. The chancellor's findings with regard to this factor are well supported by substantial evidence.

### B.     Valuation of Chris's Workshop

¶20.    Chris also claims that the trial court erred by finding that the "draining of his 401(k) in order to build a workshop addition" brought no apparent value to their marital home. Again, Chris failed to submit evidence in support of his argument. "The Mississippi Supreme Court has stated that 'the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof.'" *Benton*, 239 So. 548 (¶11) (quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶ 14) (Miss. Ct. App. 1999)). The court here was provided no such proof. No valuation for the workshop was submitted at trial and Chris testified that Wanda had not gained anything from the

10

workshop. "In the absence of *any* [proof] as to the [workshop's] valuation[] presented on [Chris's] behalf, we decline to find that the chancellor abused his discretion.*" Jenkins v. Jenkins*, 67 So. 3d 5, 13-14 (¶21) (Miss. Ct. App. 2001). *See Common v. Common*, 42, So. 3d 59, 63 (¶13) (Miss. Ct. App. 2010) ("It [i]s not the chancellor's duty to obtain appraisals of the marital property."). Presented with little to no evidence regarding the workshop's value, the court properly considered "other" relevant evidence in the form of Chris's omission and testimony. *Id*.

### C.     Destruction of the marriage

¶21.     Finally, Chris argues that the chancellor erroneously found that he contributed to the destruction of the marriage through his "addictions, poor financial dealings, and admitted adultery." As previously discussed, Chris, by his own admission, struggled with addiction which impacted his family in several respects, including financially. Contrary to Chris's contention, the record reflects that the chancellor did consider Chris's rehabilitation efforts and stated, "I don't want to fault Mr. Pond because of his addiction during the marriage, but I have to take it into consideration when dividing marital property." Although Chris's commitment to sobriety during the last five years of his marriage to Wanda is commendable, it does not negate the eleven preceding years of addiction and the resultant consequences for Chris and his family.

¶22.     Chris also conceded that he engaged in an adulterous relationship, which served as the sole grounds for the trial court's grant of the divorce. As the basis for the divorce, it logically follows that the Chris's adulterous relationship contributed to the destruction of the marriage.

As Wanda points out, the court places most of the fault towards Chris's addictions and poor financial dealings, not the adultery. In making its findings, the chancellor "noted that adultery was the ground upon which divorce was granted" and, as such, found "that it is fair and reasonable to attribute at least some fault to adultery in regards to ultimate destruction of the marriage." Substantial evidence supports this finding as well.

¶23. Accordingly and for the reasons stated above, we affirm the chancellor's findings and denial of Chris's motion for reconsideration.

¶24. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**